AMERICAN TUBE WORKS v. BRIDGEWATER IRON CO.

(Circuit Court, D. Massachusetts. September 9, 1903.)

No. 14.

1. PATENTS — SUIT FOR INFRINGEMENT — LICENSE AGREEMENT PRECLUDING MAINTENANCE.

A patentee made an agreement, for a consideration paid, to assign his patent for the term of an extension to complainant, and bound himself to make every effort to secure such an extension "under the direction" of complainant, and to forfeit a sum of money if he failed to prosecute his application "as directed by" complainant. His application for an extension was opposed by defendant, which employed counsel to defeat it. Afterward a contract was made between the patentee and defendant, by which the latter was licensed for a royalty during the term of the extended patent, and it withdrew its opposition, and the extension was granted. Less than a month before the extended term expired, complainant brought suit against defendant for its infringement, and obtained a decree with an order for an accounting. On the hearing before the master the facts in relation to the contract between complainant and its terms were shown, and defendant filed a supplemental bill based thereon for a dismissal of the suit. *Held*, that such evidence was sufficient to warrant a finding that complainant was a party to the license contract with defendant, or at least had knowledge of it, and that its failure to object or to notify defendant of its interest therein was a ratification of the same, which precluded it from maintaining a suit in equity for infringement.

In Equity. Suit for infringement of patent. On supplemental bill filed by defendant.

George W. Estabrook, for plaintiff.

Richardson, Herrick & Neave, and Clarence A. Bunker, for defendant.

COLT, Circuit Judge. This supplemental bill, brought by the defendant, raises the question whether the complainant was a party to,

or had knowledge of, the contract of June 16, 1873, entered into between the defendant and Adams, the patentee. It is clear that the original bill must be dismissed if the complainant acted in concert with Adams in making this contract, or if it had actual knowledge of the contract, and did not repudiate it.

At the time the contract was made, the complainant had a secret agreement with Adams for the assignment of the extended term of his patent, for which it had paid him a valuable consideration. By the terms of that agreement Adams was to make every effort to secure the extension "under the direction" of the complainant, and was to forfeit the sum of $5,000 if he failed to make and prosecute the application for an extension "as directed by" the complainant.

When Adams, in accordance with his agreement, made application to the Patent Office, the defendant filed objections to the extension, and employed counsel to defeat it. In this condition of affairs Adams began negotiations with the defendant, which resulted in the license and royalty contract of June 16, 1873, and the consequent withdrawal of all opposition to the grant of the extension. Under such circumstances it is immaterial whether the complainant was an actual party to this contract; or whether, having knowledge of what Adams had done, it failed to disavow his action. Adams was bound to conduct all proceedings for the extension under the direction of the complainant; and, if he made this contract without the complainant's direction or consent, the complainant should have notified the defendant as soon as it was informed of the fact. Failure to disclaim, in view of the existing relationship between the complainant and Adams, was a ratification of the contract. The complainant manifestly has no standing in a court of equity upon a bill for infringement if it concealed its knowledge of this contract from the defendant, and quietly waited until the extended term of the Adams patent was about to expire before bringing suit.

The original bill was filed July 10, 1880. The extended term of the Adams patent expired August 2, 1880. The bill charged the defendant with infringement of the Adams patent, and prayed for an injunction and account. The defendant, among other defenses, set up the contract of June 16, 1873. . Proofs were taken, and, after full hearing, the court, on February 3, 1886, directed a decree for complainant. The case was then referred to John G. Stetson, a master of long experience, high standing, and acknowledged capacity. The accounting before the master was not concluded until April 9, 1898. During these proceedings, which extended over a period of 12 years, the relations, in general and in detail, between the complainant and the defendant, and between both these parties and Adams, were fully brought out, and thoroughly examined and sifted. As a result of these long and exhaustive hearings, the master, among other things, found that the complainant was a party to the agreement of June 16, 1873. In support of this finding, the master reported, as follows:

"The circumstances under which Adams made the contract of June 16. 1873, with the Bridgewater Iron Manufacturing Company, the wording and terms of the contract, the events closely following its execution, and the omission of the complainant to bring this injunction suit till within less than

a month of the expiration of the extended term of the Adams patent, or, so far as the evidence before me shows, to make any remonstrance against, or to take any action to prevent, the defendant company's unauthorized manufacture of the cast copper cylinders of the Adams patent, support my finding that in making the contract of June 16, 1873, with the Bridgewater Iron Manufacturing Company, Adams, though appearing in the contract as principal, was the agent of and acted under the direction of the American Tube Works, so far as said contract relates to the extended term of the Adams patents.

"Adams' agreement with the American Tube Works bound him to make application for an extension of his patent, and to use all means and make all efforts in his power to obtain the same under the direction of said American Tube Works, to which company he had agreed to assign his patent for the extended term, upon obtaining the same; having received from said company full payment therefor. Pursuant to this agreement, Adams had made on May 2, 1873, the application for the extension, and the Bridgewater Iron Manufacturing Company had appeared in the Patent Office in opposition thereto, and had filed on June 4, 1873, a statement of its reasons for opposing the application. Adams had no personal interest in arranging for a withdrawal of this opposition, except that he had contracted to prosecute his application by all means and with all efforts in his power, as directed by the American Tube Works. Under these circumstances the contract between Adams and the Bridgewater Iron Manufacturing Company was made June 16, 1873; and the opposition of that company to the extension of the Adams patent thereupon ceased, to the advantage of the American Tube Works. Notice of the taking of testimony in Boston to be used in the Patent Office was acknowledged by the Bridgewater Iron Manufacturing Company, by Nahum Stetson, treasurer, who signed the contract of June 16, 1873. The notice was dated Boston, June 25, 1873, the same day the taking of testimony commenced. So far as the evidence before me shows, Dickerson & Beeman, of New York, who appeared for the Bridgewater Iron Manufacturing Company in the Patent Office, were not notified of the taking of the testimony. The magistrate who took the testimony certified that no one was present in behalf of the Bridgewater Iron Manufacturing Company. Adams, the patentee, was present, and was examined as a witness. The testimony was taken under the direction of the American Tube Works, and at its expense.

"The Bridgewater Iron Manufacturing Company made no formal withdrawal in the Patent Office of its opposition to the extension of the Adams patent after the execution of the contract of June 16, 1873, between it and Adams. It made no further opposition to the extension. It accepted service of notice, but did not appear at the taking of testimony. It took no testimony, and did nothing further in the Patent Office to oppose the extension.

"The facts stated in the two preceding paragraphs indicate clearly that a concert of action between Adams, the American Tube Works, and the Bridgewater Iron Manufacturing Company to procure the extension of the Adams patent was effected by the agreement as to license and royalty contained in the contract of June 16, 1873, and that this agreement was known by the American Tube Works as well as by the parties appearing as principals in the contract.

"The omission of the complainant to bring an injunction suit or to make any remonstrance against or to take any action to prevent the defendant company's unauthorized manufacture of the cast copper cylinders of the Adams patent is consistent with knowledge on the part of the complainant that the defendant company was entitled to a license from them under the extended term of the Adams patent upon the conditions stated in the contract of June 16, 1873, and is inconsistent with lack of such knowledge.

"That the American Tube Works had knowledge of the contract as to license and royalty under the extended term of the Adams patent which Adams had made with the Bridgewater Iron Manufacturing Company, and understood it to be a binding contract as between the two companies, is further shown by direct evidence contained in a letter sent from the Boston office of the American Tube Works, dated April 16, 1877, from E. B. Buckingham, president of that company, to Frank B. Cotton, a clerk in its employ,

then temporarily in Washington, D. C. In this letter Mr. Buckingham writes as follows:

" 'Have retained George L. Roberts, and I think him a very clear-headed person, and don't think he at first thought we had a very good case on the old patent, but he gave no decided opinion. Has now gone to New York. Will return this week. The point is, the patent is not on process, but on an article made in "way specified"; and the article itself can be produced in other ways, regardless of cost (which does not alter the matter, if it cost $1 a pound). Further, it has no inherent quality, making it obvious at sight that it is made in any special way, as Whitehouse has, by being different in shape.

" 'If we have to abandon the struggle on Adams, we have Guthrie left; but that places us in poor position, as they can say G.'s is infringement of Adams. Perhaps all we can go for is the ¾ c they promised to pay. I don't feel very "hunky" about it, but perhaps  *  *  *.' "

This finding by the master led to the bringing of the present supplemental bill, charging that the complainant was a party to the contract of June 16, 1873, or that it had knowledge of such contract, which it wrongfully concealed from the defendant, to its great injury, and praying that the original bill be·dismissed, with costs.

In defense of the supplemental bill the complainant introduced a stipulation as to the death of Adams, James F. Guthrie, and Edward Buckingham, former president of the complainant corporation, and as to the fact that both complainant and defendant were Massachusetts corporations. It offered no new evidence of material importance, although it appears that one or more witnesses are living, who could throw much light upon the relation of the complainant to the contract of June 16, 1873, and who could help to disprove its want of knowledge of the contract if such were the fact. The defendant, in support of the supplemental bill, brought forward substantially the same evidence as was before the master. Upon this state of proof, the question now presented is practically the same as if the court were reviewing the finding of the master.

Upon a careful and independent consideration of the evidence, I am satisfied that the finding of the master was right, and that he could have reached no other conclusion.

All the presumptions, facts, circumstances, and acts of the parties are consistent with the complainant's knowledge of this contract, and inconsistent with any other theory. Such knowledge is consistent with the presumption that the secret agreement of December 8, 1869, was carried out in good faith by both parties; that Adams did not violate his duty in the performance of his part of the agreement; and that all his efforts to obtain the extension of his patent were made under the direction of the complainant. This presumption becomes very strong when we bear in mind that Adams had no personal interest in the extension, but a very strong pecuniary interest in not concealing any step he took from the complainant, since he was liable to a penalty of $5,000 if he failed to make application, "and by all means and with all efforts" prosecute the same in good faith "as directed by" the complainant. Such knowledge is also consistent with the application which Adams filed in the Patent Office, and his accompanying sworn statement concealing the fact that he had agreed to assign the extended term to the complainant. This statement was made in the interest of the complainant, since, if it had come to the knowledge

124 F.—50

of the Patent Office that the complainant was in fact the owner of the extended term, it would probably have defeated the grant. Such knowledge is also consistent with the close relation of Adams' counsel to the complainant, with the terms of the contract of June 16, 1873, and the circumstances under which it was made, with the subsequent withdrawal of defendant's opposition to the extension, with the facts relating to the taking of testimony on June 25, 1873, in support of the extension, and with the failure of the complainant to bring suit for infringement until within a few days of the expiration of the extended term. Such knowledge is also consistent with the direct evidence contained in the Buckingham letter of April 16, 1877, in which the president of the complainant company, after expressing doubts as to the success of a suit for infringement, said: "Perhaps all we can go for is the ¾ c they promised to pay"—this being the amount of royalty named in the contract of June 16, 1873; and with the letter from Frank H. Cotton, an employé of complainant company, to William Cotton, its treasurer, dated April 18, 1877, which said, "I find I am acquainted with R. K. Evans here, one of the lawyers who argued our case when applying for the extension."

It is impossible to explain these facts and circumstances upon any other theory than the full knowledge by the complainant of the contract in question. The improbability, inconsistency, and confusion which attend the effort to show complainant's want of knowledge of the contract is illustrated by its attempted explanation of what the Buckingham letter might have meant. It is due, however, to the complainant, to say that it does not rely upon its forced explanation of the Buckingham letter and other circumstances, but rests its defense mainly upon the failure of the defendant to prove its case. An unbroken chain of circumstantial evidence may be as convincing as direct proof; and where, as in the case at bar, we have, in addition to such a chain, the direct evidence of the Buckingham letter, it may be said that a case has been made out which is free from reasonable doubt. It follows that the prayer of the supplemental bill should be granted, and the original bill dismissed, with costs; and a decree may be entered accordingly.